UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------ x
JESSICA BURCIAGA, CLAUDIA        :
SAMPEDRO, JANET GUZMAN, ROSA     :
ACOSTA, BRENDA GEIGER, IESHA     :
MARIE CRESPO, GALLIENNE NABILA   :
STEPHANIE RAO, AND LAUREN WOOD,  :
                                 :
          Plaintiffs,            :
v.                               :
                                 : Civil No. 3:24-cv-1996 (AWT)
TROPIX ULTRA LOUNGE, LLC d/b/a   :
TROPIX ULTRA LOUNGE a/k/a TROPIX :
ULTRA; TROPIX CARIBBEAN GRILLE,  :
LLC d/b/a TROPIX CARIBBEAN       :
GRILLE a/k/a TROPIX ULTRA; and   :
GAIRY BLAKE,                     :
                                 :
          Defendants.            :
------------------------------ X
```

## RULING ON MOTION TO DISMISS

Plaintiffs Jessica Burciaga, Claudia Sampedro, Janet Guzman, Rosa Acosta, Brenda Geiger, Iesha Marie Crespo, Gallienne Nabila, Stephanie Rao, and Lauren Wood bring an eight-count complaint against Tropix Ultra Lounge, LLC; Tropix Caribbean Grille, LLC; and Gairy Blake.

Each plaintiff is a professional model who claims the defendants misappropriated and used without authorization her images, photos, and likenesses. The First Cause of Action alleges the defendants falsely associated themselves with the plaintiffs in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). The Second Cause of Action alleges the defendants

violated the plaintiffs' common law right to privacy under
Connecticut law by appropriating their likenesses. The Third
Cause of Action alleges the defendants violated the plaintiffs'
common law right to privacy under Connecticut law by portraying
the plaintiffs in a false light. The Fourth Cause of Action
alleges the defendants violated the Connecticut Unfair Trade
Practices Act, Conn. Gen. Stat. § 42-110b. The Fifth Cause of
Action alleges the defendants were negligent under Connecticut
law. The Sixth Cause of Action alleges the defendants converted
the plaintiffs' property rights in their images. The Seventh
Cause of Action alleges the defendants unjustly enriched
themselves. The Eighth Cause of Action is a claim for quantum
meruit.

The defendants have moved to dismiss the following causes
of action: the First (Lanham Act claim for false association) as
to plaintiff Burciaga only, and as to all plaintiffs the Third
(false light), Fifth (negligence), Sixth (conversion), and
Eighth (quantum meruit). The defendants argue that Burciaga's
Lanham Act claim in the First Cause of Action is barred by the
doctrine of issue preclusion and that the Third, Fifth, Sixth,
and Eighth Causes of Action should be dismissed in their
entirety because they fail to state a claim upon which relief
can be granted. The plaintiffs have withdrawn the claims in the
Sixth and Eighth Causes of Action. See Plaintiffs' Memorandum of

Law in Opposition to Defendants' Partial Motion to Dismiss (ECF
No. 23) ("Pl. Mem.") at 6 n.2.

For the reasons set forth below, the motion to dismiss is
being granted with respect to the Sixth and Eighth Causes of
Action, and otherwise it is being denied.

## I. FACTUAL ALLEGATIONS

"The complaint, which we must accept as true for purposes
of testing its sufficiency, alleges the following
circumstances." <u>Monsky v. Moraghan</u>, 127 F.3d 243, 244 (2d Cir.
1997). Each plaintiff "is a well-known professional model who
earns her livelihood modeling and licensing her [i]mages to
companies, magazines and individuals for the purpose of
advertising products and services." Compl. (ECF No. 1) ¶ 27.

Jessica Burciaga is a:

model and a business owner. . . . Burciaga began modeling
in 2005 when she submitted a few photos to Stuff Magazine.
The magazine responded by flying her out to New York for a
photo shoot. After Burciaga's first photo shoot, she won
Stuff Magazine's, "Neighborhood Knockout," contest. The
prize was $5,000, a 4-page spread in the magazine, and an
appearance as a ring girl in EA Sports Fight Night Round 3
video game. Burciaga's popularity rose quickly, and she
began appearing in various magazines including Playboy,
Maxim, Import Tuner, Modified Mag, Performance Auto &
Sound, Show Latina, Lowrider Magazine, and many others.
Burciaga was the Playboy Playmate of the Month for February
2009 and has appeared as herself in several episodes of the
reality TV series The Girls Next Door. She has various
business ventures, including a women's online clothing
boutique, www.SailorandSaint.com. Burciaga's social media
reach has surpassed 1.4 million followers on Instagram,
over 3.2 million Facebook followers, and over 165,500
followers on X (formerly known as Twitter).

<u>Id.</u> ¶ 34.

Claudia Sampedro is:

a Cuban born model, mother, and spokeswoman. . . . [A]t age 16, was discovered by Elite models. Sampedro has appeared in many catalogues, and magazine editorials. She has a number of cover credits for magazines such as Nine 5 Four, Shock, Face to Face and Mixed. Sampedro is a sponsored model for Nutri Sups Nutrition and is also a spokesmodel and contracted model for Bare Ava. Sampedro has three children and is married to former Green Bay's star defensive end Julius Peppers. Sampedro is in the Social Media Influencers top class with over a million Instagram followers and a further combined 150,000 fans on Facebook and X (formerly known as Twitter).

<u>Id.</u> ¶ 37.

Janet Guzman is:

a social media star who is widely known for her self titled Instagram page. She has gained popularity there for her modeling and lifestyle photos, surpassing over 2 million followers. She's widely known to be Fashion Nova's number 1 featured talent. She mostly promotes the clothes of the Fashion Nova clothing brand on her Instagram and has also appeared on the Fashion Nova Billboard located at Melrose and Fairfax (California). She was featured in an exclusive video interview with Fashion Nova in March of 2022. She has also seen her janetguzman_TikTok channel become widely popular, with her videos on the platform earning over 1.9 million total likes. She also runs a popular OnlyFans subscription account and a travel\/lifestyle\/fashion vlog on YouTube.

<u>Id.</u> ¶ 40.

Rosa Acosta started:

her classic ballet studies at the age of four at the Centro de la Cultura in Santiago, Dominican Republic. She later moved on to the ICA, (Instituto de Cultura y Arte), where she excelled as one of the most gifted students of the academy. After graduating with honors from the ICA and the Ballet School of Norma Garcia with a bachelor's in art with

mention to Classic Ballet, she became part of the Dominican Nacional Ballet as the youngest soloist member in 2002. Partaking in all major classic and modern shows in the Dominican Republic, she was nominated twice by the Secretaria de Estado de la Juventud for her work in the category of Cultural Development. She initiated her modeling career in 2004, participating in magazines and television for prestigious Dominican enterprises. Acosta moved to the United States in 2006 where her career took a new turn, distinguishing herself in several areas of the modeling world, featuring in magazines, radio, television programs and commercials and numerous music videos. She has over 52,000 Facebook followers, over 1.6 million Instagram followers, and over 280,600 Twitter followers.

Id. ¶ 43.

Brenda Geiger is:

a professional model and actress who performed with eight-time Grammy nominee rapper Lil Wayne in a music video for two-time Grammy nominee singer Keri Hilson. She is most known for her work in Glamour Magazine and her appearance on "The Howard Stern Show" in a "Miss HTV March" contest. Geiger has appeared in numerous magazines such as Show, Maxim and Raw, and has modeled for several product campaigns such as Primitive Clothing, where she currently has her own line of custom skateboard decks.

Id. ¶ 46.

Marie Crespo is:

an American model and video star with combined social media following of nearly a million. Crespo has been featured in a number of magazines and has the covers of Models Latina March 2015 and Shock magazine. Crespo has also appeared in several catalogues such as Raw and Uncut and appeared in a dozen music videos for artists such as Rick Ross and French Montana.

Id. ¶ 49.

Gallienne Nabila is:

an actress and model residing in Los Angeles, California. From a young age she participated in pageants, public

speaking, dance, community service work, and singing.
Nabila has been in the entertainment industry for over a
decade working with brands such as Fashion Nova. She is
currently signed to Wilhelmina Los Angeles and has a
nonprofit geared towards the empowerment and advancement of
young women. Nabila has over 2 million social media
followers.

Id. ¶ 52.

Stephanie Rao currently:

is an influencer\/model. She is currently representing
Fashion Nova and has previously worked for Shein &
PrettyLittleThing. She has appeared alongside Kim
Kardashian in a Carolina Lemke glasses advertisement as
well as other high profile ad campaigns. She has her own
website which focuses on providing a fitness journey to her
clients and promoting physical, mental, and spiritual
wellness. Rao has over 1.1 million Instagram followers.

Id. ¶ 55.

Lauren Wood:

after 8 years of serving in the Air Force, took her flight
to a new career in Hollywood, winning hearts with her
television debut on MTV's Wild N' Out where she starred on
5 seasons and quickly gained recognition as the fan's
favorite. This led to many opportunities on various TV
shows, movies, and a long run in the modeling industry,
booking countless fashion campaigns and billboards. Her
down-to-earth authenticity, quick wit, and great sense of
humor positioned her to join Rob Dyrdek and Steelo Brim on
MTV's Ridiculousness. A young mom, often sharing parenting
and healthy lifestyle tips with her online community of
over 2 million people ([Instagram] (1.7M) [T]ik[T]ok
(125k), YouTube (4k) and X aka Twitter (38k), Wood dreams
of restoring the sisterhood of women worldwide, reinstating
the beautiful tradition of solidarity, support, and
resilience.

Id. ¶ 58.

Defendants Tropix Ultra Lounge, LLC, and Tropix Caribbean

Grille, LLC (collectively, "Tropix") are both Connecticut-based

businesses. Tropix Ultra Lounge is a nightclub in Waterbury, Connecticut, and Tropix Caribbean Grille is a restaurant in Hartford, Connecticut. The plaintiffs allege that Tropix Ultra Lounge and Tropix Caribbean Grille are "sister establishments." Id. ¶ 9. Defendant "Gairy Blake, in his capacity as principal, owner, and/or CEO [of Tropix], maintained operational control over [Tropix], including all advertising related thereto." Id. ¶ 24.

The plaintiffs allege they were depicted, without their authorization, in photos on the defendants' social media pages.[1] The plaintiffs allege these images "were intentionally altered to make it appear that [each plaintiff] was either an employee working at Tropix, that she endorsed Tropix, or that she was otherwise associated or affiliated with Tropix." Id. ¶ 35. The plaintiffs allege they have never been employed by, hired to endorse, or otherwise associated with the defendants. None of the plaintiffs has received remuneration for the defendants' unauthorized use of their likenesses and images.

The defendants appropriated the plaintiffs' images and likenesses "for their own commercial and financial benefit." Id.

---

[1] The photos at issue are exhibits to the Complaint. See Exhibit A (ECF No. 1-1) (altered photos of Burciaga); Exhibit B (ECF No. 1-2) (altered photo of Sampedro); Exhibit C (ECF No. 1-3) (altered photos of Guzman); Exhibit D (ECF No. 1-4) (altered photos of Acosta); Exhibit E (ECF No. 1-5) (altered photo of Geiger); Exhibit F (ECF No. 1-6) (altered photos of Crespo); Exhibit G (ECF No. 1-7) (altered photo of Nabila); Exhibit H (altered photos of Rao); Exhibit I (altered photo of Wood).

¶ 64. Because the defendants used their social media pages to promote Tropix and attract patrons, they created "the false impression with potential clientele that [the plaintiffs] either worked at, endorsed Tropix, or was otherwise associated or affiliated with Tropix." Id. ¶ 65. This allowed the defendants to "receive certain benefits from that false impression, including but not limited to monetary payments; increased promotional, advertising, marketing, and other public relations benefits; notoriety; publicity; and an increase in business revenue, profits, proceeds, and income." Id. ¶ 66.

The plaintiffs allege that their "careers in the modeling industry place a high degree of value on their good will and reputation, which is critical to maximize their earning potential, book modeling contracts, and establish each of their individual brands." Id. ¶ 28. Because of their desire to "establish[] and maintain[] their brands, Plaintiffs are necessarily selective concerning the companies, and brands, for which they model." Id. Thus, the plaintiffs "allege that any improper unauthorized use of their Images at issue in this case has substantially injured their respective careers and reputations, because of the negative connotations of false impression of association with Tropix." Id. ¶ 76.

## II. LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the

court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). See also Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86 (2d Cir. 2015) ("[T]he court must assume the factual allegations in the complaint to be true, 'even if [they are] doubtful in fact'. . . ." (citation omitted)). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "On a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" Id. (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

"Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (internal quotation marks omitted). However, the plaintiff must plead "only enough facts

to state a claim to relief that is plausible on its face." Id. at 547. "A claim has facial plausibility when the [claimant] pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). "Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557).

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir. 1993).

## III. DISCUSSION

### A. First Cause of Action: Burciaga's Lanham Act Claim

The only argument the defendants make in support of their position that Burciaga's Lanham Act claim should be dismissed is that it is barred by the doctrine of issue preclusion.

Section 43(a) of the Lanham Act prohibits the:

use[] in commerce [of] any word, term, name, symbol, or
device, or any combination thereof, or any false
designation of origin, false or misleading description of
fact, or false or misleading representation of fact
which . . . is likely to cause confusion, or to cause
mistake, or to deceive as to the affiliation, connection,
or association of such person with another person, or as to
the origin, sponsorship, or approval of his or her goods,
services, or commercial activities by another person[.]

15 U.S.C. § 1125(a)(1)(A). "This provision is intended to

prevent consumer confusion regarding a product's source, to

enable those that fashion a product to differentiate it from

others on the market, and to protect against the risk that

consumers will mistakenly believe that the trademark owner

sponsors or endorses the use of the challenged mark." Souza v.

Exotic Island Enters., Inc., 68 F.4th 99, 109–10 (2d Cir. 2023)

(internal quotation marks omitted).

To prevail on a false association claim under Section 43 of

the Lanham Act, "a plaintiff must prove, among other [things],

'that there is the likelihood of confusion between the

plaintiff's good or service and that of the defendant.'" Id. at

110 (quoting Electra v. 59 Murray Enters., Inc., 987 F.3d 233,

257 (2d Cir. 2021)). "To determine whether there is a likelihood

of consumer confusion, we look to our eight familiar Polaroid

factors: (1) strength of the trademark; (2) similarity of the

marks; (3) proximity of the products and their competitiveness

with one another; (4) evidence that the senior user may bridge

the gap by developing a product for sale in the market of the

alleged infringer's product; (5) evidence of actual consumer
confusion; (6) evidence that the imitative mark was adopted in
bad faith; (7) respective quality of the products; and (8)
sophistication of consumers in the relevant market." Id. at 110
(citing Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492,
495 (2d Cir. 1961)). "Those factors are neither exhaustive nor
applied mechanically." Id. (citations omitted). "No single
factor is dispositive; rather, each is evaluated 'in the context
of how it bears on the ultimate question of likelihood of
confusion as to the source of the product.'" Id. (quoting
Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 130
(2d Cir. 2004)).

With respect to the first Polaroid factor, recognizability
is the "'bottom line' barometer for strength of mark . . . ."
Souza, 68 F.4th at 110. "[I]n celebrity false endorsement cases
the strength of the mark refers to the level of recognition that
the plaintiff has among the consumers to whom the advertisements
are directed." Id. (internal quotation marks omitted). Courts
"analyze[] the record of each [plaintiff's] public prominence to
determine the strength of their marks." Id.

Courts "principally determine a mark's strength by
reference to 'the market in which the mark is used.'" City of
New York v. Henriquez, 98 F.4th 402, 414 (2d Cir. 2024) (quoting
Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C., 182 F.3d

133, 139 (2d Cir. 1999)). "[T]o achieve the status of a strong
mark, [a] plaintiff must demonstrate distinctiveness in the
relevant market, for if the mark is not recognized by the
relevant consumer group, a similar mark will not deceive those
consumers and thereby increase search costs." Brennan's, Inc. v.
Brennan's Rest., L.L.C., 360 F.3d 125, 132 (2d Cir. 2004)
(citations omitted). "[T]he relevant market is the pool of
actual and potential customers of [the defendants], for it is
those patrons whose potential confusion is at issue." Id.

The defendants argue that "another district court in this
Circuit has already decided that Burciaga's identity is not a
sufficiently strong mark for purposes of the Lanham Act and is
not capable of causing consumer confusion." Memorandum of Law in
Support of Defendants' Motion to Dismiss (ECF No. 14) ("Def.
Mem.") at 6. Therefore, they contend that "[i]ssue preclusion,
or collateral estoppel, . . . bars successive litigation of
Burciaga's false association or false endorsement claim." Id.
See also Defendants' Reply Memorandum in Further Support of
Their Motion to Dismiss (ECF No. 26) ("Def. Rep.") at 2.
("[A]nother court in this Circuit has already held with the
benefit of a full record following a motion for summary judgment
that Ms. Burciaga does not have a sufficiently recognizable mark
to sustain a false endorsement claim under the Lanham Act.")

Issue preclusion, or collateral estoppel, "prevents parties

or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 288 (2d Cir. 2002) (citations omitted). Issue preclusion applies when: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." <u>Id.</u> at 288–89 (internal quotation marks omitted).

With respect to the first prong, "the issue decided in the earlier case and the issue to which the [defendant] seeks to give preclusive effect [must] be identical." <u>Bifolck v. Philip Morris USA Inc.</u>, 936 F.3d 74, 80–81 (2d Cir. 2019). Issue preclusion is "concerned not with 'claims or . . . causes of action as a whole,' but with issues—-'single, certain and material point[s] arising out of the allegations and contentions of the parties . . . .'" <u>Id.</u> at 81 (alterations in original) (quoting <u>Matusick v. Erie Cty. Water Auth.</u>, 757 F.3d 31, 48 (2d Cir. 2014)). The "[i]dentity of the issue is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules." Wright & Miller, 18 Fed. Prac. & Proc. Juris. § 4425 Issue Preclusion—Questions of Law and Law Application (3d

ed. 2025). "Preclusion should not apply if there has been a change either in the facts or the governing rules." Id. See also Restatement (Second) of Judgments § 27 (1982) ("Unless a [losing party] can establish changed circumstances occurring in the time between the two [sets of litigation], the prior judgment is conclusive . . . .").

In Gibson v. SCE Grp., Inc., Burciaga and other models sued two New York City strip clubs, claiming, inter alia, that the strip clubs violated § 43 of the Lanham Act by using without authorization the models' "pictures to advertise their commercial establishments." 391 F. Supp. 3d 228, 244 (S.D.N.Y. 2019). Burciaga and the other plaintiffs in that case claimed that use by the strip clubs of their protected marks--their likenesses--in advertisements were likely to cause consumer confusion as to their association with or sponsorship of the strip clubs.

At summary judgment, the court applied the factors set out in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961), to determine whether Burciaga and the other plaintiffs had established consumer confusion for purposes of the Lanham Act. In analyzing the Polaroid factors, the court concluded that "strength of the trademark", "evidence of actual consumer confusion", "evidence that the imitative mark was adopted in bad faith", and "sophistication of consumers in the

relevant market" weighed against Burciaga and her co-plaintiffs; "similarity of the marks" weighed in their favor; and "proximity of their products and competitiveness with one another" was neutral. Gibson, 391 F. Supp. 3d at 245-249.

With respect to the first Polaroid factor--strength of mark--Burciaga and her fellow plaintiffs "rel[ied] on . . . [their] resumes and their social media accounts" to argue they had sufficiently strong marks to sustain their Lanham Act claims. Id. The court noted that Burciaga and the other plaintiffs "ha[d] not provided any survey that directly shows general consumer recognition or specific recognition by [the strip clubs'] customers." Id. at 246. "[I]n the absence of a consumer survey, . . . the court [could not] conclude that any of them have attained the level of celebrity that other courts in this Circuit have considered to constitute strong marks." Id. at 247.

After balancing the Polaroid factors, the court held that Burciaga and the other plaintiffs had not established their Lanham Act claim. That holding was affirmed on appeal. See 2023 WL 4229913 (2d Cir. June 28, 2023).

Burciaga contends that the factual issues in Gibson and this case are not identical.[2] The court agrees.

---

[2] Burciaga also argues that the motion to dismiss should be denied because "first, no court evaluating a Rule 12 motion will address the Polaroid factors, including evidence of strength of mark . . . , and, second, prior to

As discussed above, a "plaintiff must demonstrate
distinctiveness in the relevant market . . . ." Brennan's, Inc.,
360 F.3d at 132 (citations omitted). "[T]he relevant market is
the pool of actual and potential customers of [the
defendants][.]" Id. The relevant market in Gibson was the pool
of actual and potential customers of the New York City strip
clubs; here, the relevant market is the pool of actual and
potential customers of Tropix. Thus, the facts of both cases
relevant to the question of whether Burciaga has a sufficiently
strong mark are not indistinguishable. See Wright & Miller, 18
Fed. Prac. & Proc. Juris. § 4425 Issue Preclusion—Questions of
Law and Law Application (3d ed. 2025) ("Preclusion should not
apply if there has been a change either in the facts or the
governing rules.")

Therefore, Burciaga's Lanham Act claim is not barred by the
doctrine of issue preclusion.

B. **Third Cause of Action: False Light**

The defendants argue that the plaintiffs have failed to
state a claim for false light invasion of privacy under

---

Souza and Gibson . . . , the Second Circuit had never issue[d] a bright line
rule concerning this Polaroid strength of mark factor." Pl. Mem. at 4.
    As to the first argument, "[i]n the context of a motion to dismiss,
courts have disposed of trademark claims where simply looking at the work
itself, and the context in which it appears, demonstrates how implausible it
is that a viewer will be confused into believing that the plaintiff endorsed
the defendant's work." The Cousteau Soc'y, Inc. v. Cousteau, 498 F. Supp. 3d
287, 309 (D. Conn. 2020) (internal quotation marks omitted). Also, in light
of the court's conclusion that the factual issues in Gibson and this case are
not identical, the court does not address the second argument.

Connecticut law. The defendants assert that "[t]here is nothing offensive, standing alone" about the alleged false impression that plaintiffs endorsed or were affiliated with Tropix, so the "[p]laintiffs fail to allege facts suggesting that such a false light 'would be highly offensive to a reasonable person'" as required under Connecticut law. Def. Mem. At 8.

Under Connecticut law, "a false light invasion of privacy occurs if '[1] the false light in which the other was placed would be highly offensive to a reasonable person, and [2] the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.'" Goodrich v. Waterbury Republican-Am., Inc., 188 Conn. 107, 131 (1982) (quoting Restatement (Second) of Torts § 652E (1977)). The false light tort "protects one's interest in not being placed before the public in an objectionable false light or false position, 'or in other words, otherwise than as he is.'" Id. (quoting Restatement (Second) of Torts § 652E (1977)).

The requirement that a plaintiff has been placed in a false light that would be highly offensive to a reasonable person, is met:

> only when the defendant knows that the plaintiff, as a
> reasonable [person], would be justified in the eyes of the
> community in feeling seriously offended and aggrieved by
> the publicity. Complete and perfect accuracy in published
> reports concerning any individual is seldom attainable by

> any reasonable effort, and most minor errors, such as a
> wrong address for [her] home, or a mistake in the date when
> [s]he entered [her] employment or similar unimportant
> details of [her] career, would not in the absence of
> special circumstances give any serious offense to a
> reasonable person. The plaintiff's privacy is not invaded
> when the unimportant false statements are made, even when
> they are made deliberately. It is only when there is such a
> major misrepresentation of [her] character, history,
> activities or beliefs that serious offense may reasonably
> be expected to be taken by a reasonable [person] in [her]
> position, that there is a cause of action for invasion of
> privacy.

Restatement (Second) of Torts § 652E cmt. c (1977). "Generally,
'[w]hether the matter communicated to the public would be highly
offensive to a reasonable person sufficient to support a false
light claim presents a question of fact for the trier of fact.'"
Chiaravallo v. Middletown Transit Dist., 561 F. Supp. 3d 257,
292 (D. Conn. 2021) (alteration in original) (quoting Chernovetz
v. Harries, 2021 WL 1912461, at *5 (Conn. Super. Ct. Apr. 27,
2021)).

The Complaint alleges that the "[p]laintiffs' careers in
the modeling industry place a high degree of value on their good
will and reputation, which is critical to maximize their earning
potential, book modeling contracts, and establish each of their
individual brands." Compl. ¶ 28. "In furtherance of
establishing, and maintaining, their brands, Plaintiffs are
necessarily selective concerning the companies, and brands, for
which they model." Id. In paragraph 116, the Complaint alleges
"republication of [p]laintiffs' image and likeness was altered

so as to reach a new audience and/or promote a different
product." In paragraph 117, the Complaint alleges "Defendants
invaded and violated Plaintiffs' privacy and portrayed them in a
false light by creating the false impression with the consumers
that Plaintiffs were either working at Defendants'
establishments, endorsed same, were affiliated, associated, or
otherwise connected with same, or had agreed to promote same."
In paragraph 118, the Complaint alleges that "[a]ffiliation with
Defendants' establishments could lead to significant potential
career and personal damage to a professional model because it
could lead other clients to refuse to work with them or drop
them as a model."

Accepting these factual allegations as true and drawing
inferences in a light most favorable to the plaintiffs, the
Complaint alleges facts that could establish that a false
impression of association with Tropix is highly offensive to a
reasonable person. See Lancaster v. Ecuadorian Inv. Corp., 2020
WL 1863305, at *2 (D. Conn. Apr. 14, 2020) (plaintiff models'
allegations that clients might refuse to hire them due to their
perceived affiliation with a night club was sufficient to plead
that the unauthorized use of their images was highly offensive);
Moreland v. Beso Lounge & Rest. LLC, 2020 WL 5302312, at *6 (D.
Conn. Sept. 4, 2020) (same). See also Souza v. Algoo Realty,
LLC, 2020 WL 5300925, at *8 (D. Conn. Sept. 4, 2020) (holding

that night club's unauthorized use of models' likenesses could be highly offensive to a reasonable person while noting that the question was "something of a close call" because there were no allegations that the night clubs hosted nude or semi-nude performances or that the images of the models were altered).

The defendants argue that "[t]here is nothing offensive, standing alone, about a nightclub, and the allegations here are distinguishable from those cases brought on behalf of similarly-situated plaintiffs against defendants who own or operate strip clubs or gentleman's clubs." Def. Mem. at 8 (citing cases). However, the fact that being associated with a strip club would be highly offensive to a reasonable person does not dictate the conclusion that being associated with a night club cannot be highly offensive to a reasonable person under a particular set of facts and circumstances. See Algoo Realty, LLC, 2020 WL 5300925, at *8.

Therefore, the motion to dismiss is being denied as to the Third Cause of Action.

### C. Negligence

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." Archambault v. Soneco/NE., Inc., 287 Conn. 20, 32 (2008) (internal quotation marks omitted). As to the first element, "[t]he nature of the duty, and the specific persons to

whom it is owed, are determined by the circumstances surrounding the conduct of the individual." Bloomfield Health Care Ctr. of Conn., LLC v. Doyon, 185 Conn. App. 340, 353 (quoting Munn v. Hotchkiss School, 326 Conn. 540, 548 (2017)).

> The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised. . . . By that [it] is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury [that] resulted was foreseeable[.] . . . [T]he test for the existence of a legal duty entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case.

Munn, 326 Conn. at 548 (2017) (internal quotation marks omitted).

With respect to the public policy analysis, "Connecticut courts addressing public policy questions have considered four factors to determine whether to impose a duty in negligence cases: '(1) the normal expectation of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions.'" Munn v. Hotchkiss School, 795 F.3d 324, 332 (2d Cir. 2015) (quoting Monk v. Temple George Assocs., LLC, 273 Conn. 108, 118 (2005)).

The defendants argue that "the lack of any alleged relationship between the parties, the self-professed widespread availability of Plaintiffs' photos on the internet and social media (without any clear licensing terms or restrictions alleged), and the increased litigation that has already ensued as a result of the dozens, if not hundreds, of substantively similar lawsuits in this and other jurisdictions, militates against finding a duty of care, particularly where other statutory and common law remedies exist to protect the conduct at issue." Def. Mem. at 12-13.

However, "[c]ertainly, the Defendants knew that the use of Plaintiffs' images may affect the Plaintiffs' reputations; indeed, arguably, [t]he Defendants were hoping for some benefit from the public exploitation of the Plaintiffs." Geiger v. C&G of Groton, Inc., 424 F. Supp. 3d 276, 300 (D. Conn. 2019). See Compl. ¶ 64 (alleging the defendants used the plaintiffs' images without authorization for "their own commercial and financial benefit"). "Likewise, given the potential applicability of statutory and common-law protections against the actions alleged to have been undertaken by the Defendants, such as the Lanham Act, false light invasion of privacy, and CUTPA, there may be valid public policy reasons for extending a duty of care in this context." Geiger, 424 F. Supp. 3d at 300. "Because further development of the facts during the course of discovery may shed more light on this issue

-23-

[of public policy] as well as on the issue of foreseeability--
these issues need to be resolved on a more complete record." Id.
(internal citations omitted).

Therefore, the motion to dismiss is being denied as to the
Fifth Cause of Action.

**IV. CONCLUSION**

For the reasons set forth above, the defendants' Motion to
Dismiss (ECF No. 13) is hereby GRANTED in part and DENIED in
part. The Sixth and Eighth Causes of Action are hereby
dismissed, and the motion is being denied as to the First,
Third, and Fifth Causes of Action.

It is so ordered.

Dated this 12th day of March 2026, at Hartford,
Connecticut.

                            /s/AWT
                       _____
                        Alvin W. Thompson
                   United States District Judge